## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-80183-CIV-SEITZ/MCALILEY

|  |  |
|---|---|
| BOCA RATON COMMUNITY HOSPITAL, INC., a Florida not-for-profit corporation d/b/a BOCA RATON COMMUNITY HOSPITAL, on behalf of itself, and on behalf of a Class of all others similarly situated, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TENET HEALTHCARE CORPORATION, | ) ) |
| Defendant. | ) ) ) |

---

### TENET HEALTHCARE CORPORATION'S MOTION TO EXCLUDE THE PROFFERED EXPERT REPORT AND TESTIMONY OF JOAN DAVANZO, PH.D. AND ALL EXPERT TESTIMONY BASED ON THE SO-CALLED "LEWIN MODEL"

Peter Prieto (FL Bar No. 501492)
Martha R. Mora (FL Bar No. 648205)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500 (tel.)
(305) 789-7799 (fax)

Jay P. Lefkowitz
Karen N. Walker
Susan E. Engel
Patrick M. Bryan
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000 (tel.)
(202) 879-5200 (fax)

*Attorneys for Tenet Healthcare Corporation*

October 31, 2006

## INTRODUCTION

Boca's (latest) theory of liability is that Tenet wrongfully "took outlier payments to which it was not entitled by breaking any rational or reasonable relationship between charges and costs by driving hospital CCRs below the low National Threshold." Reply Mem. in Support of Pl.'s Renewed Mot. for Class Cert. at 1 (attached as Exhibit 1). As a result, according to Boca, CMS "automatically raised" the Fixed-Loss Threshold ("FLT"), causing Boca to receive less than it "would have received but for the wrongful conduct" of Tenet. Am. Compl. ¶¶ 1, 69. Boca's theory of liability (and any calculation of damages in this case) thus requires Boca to demonstrate that Tenet's allegedly unlawful conduct—*i.e.*, intentionally inflating gross charges and "driving" its CCRs below the low National Threshold—caused CMS to increase the FLT *and* to demonstrate what portion of the increase in the FLT in each year of the proposed class period was attributable to that conduct.[1] To that end, Boca has proffered three "experts" who contend that by using the so-called "Lewin Model"—a disparate collection of algebraic formulae—they have calculated what the FLT would have been had a subset of Tenet hospitals not engaged in "turbocharging" and thereby have determined damages to the proposed class. The "Lewin Model," however, is fundamentally flawed and is incapable of calculating the impact, if any, of Tenet's alleged wrongful conduct on the FLT. In short, the "Lewin Model" is unconnected to Boca's theory of liability and is therefore wholly speculative and unreliable.

Boca's proposed damages methodology is not based on or tied to Tenet's alleged wrongful conduct at all: in calculating a "Tenet-adjusted FLT," Boca's experts assume that Tenet's allegedly unlawfully high charges remain exactly the same as they were in the actual world and that Tenet's so-called "actual" CCRs remain below the low National Threshold. Put simply, the "Lewin Model" assumes that Tenet continued to "turbocharge" and, instead, alters only CMS's behavior with respect to what data it would consider in setting the FLT. This is

---

[1] *See* June 5, 2006 Class Cert. Hr'g ("Hr'g Tr.") at 48 ("[A] key to the [plaintiff's] damages formula, is what portion of the increase in the fixed loss threshold was caused by Tenet.") (attached as Exhibit 2). Indeed, the Court has asked whether Boca intends to demonstrate to the Court how it proposes to calculate what portion of the increase in the FLT, if any, is attributable to Tenet's alleged conduct. *See id.* at 47 ("Have your experts or are your experts ... going to show me how they would calculate the portion of the increase in the FLT that is attributable to Tenet? A: 'Yes.'"); *see also id.* at 132-33 ("One of the questions I'm going to have with the plaintiffs on rebuttal is how is your expert coming up with a calculation for turbocharging and assessing the turbocharge? How are you coming up with the distinction so we can test that calculation to how valid it is?").

underscored by the fact that—as Boca's experts concede—the "Lewin Model" calculates that nearly every proposed class hospital (including Boca) "directly caused" the FLT to increase and therefore caused damages to themselves.  Because the "Lewin Model" does not assess, and is incapable of assessing, what impact, if any, Tenet had on the FLT, all opinions based on it are speculative and should be held inadmissible.

Beyond its patent methodological flaws, the "Lewin Model" also fails to satisfy the minimum standards of reliability required under Fed. R. Evid. 702.  Specifically, Boca's experts have failed to apply their (defective) model in a consistent manner and, in fact, have failed to satisfy even their own subjective standards for reliability.  Indeed, Boca's expert, Mr. Haught, concedes that the "Lewin Model" suffers from numerous errors in design and application and is, by his own account, far from reliable: *"We're continuing to compile a list of the problems that we're finding."*  Haught Dep. Tr. at 50-51 (attached as Exhibit 3).[2]

Because Boca's proposed damages model is unconnected to plaintiff's theory of liability and suffers from numerous errors in application and execution, Boca's experts' testimony and conclusions based on the "Lewin Model" should be excluded and not considered for any purpose, including class certification.[3]

## BACKGROUND

Boca has designated three "experts"—Joan DaVanzo, Ph.D., Mr. Randall Haught, Allen Dobson, Ph.D (collectively, "Boca's experts")—each of whom relies solely on the so-called "Lewin Model" to opine that Tenet's alleged "turbocharging" "directly caused" the FLT to increase and thereby caused damages to the proposed class.  6/16/06 Expert Report of Joan

---

[2]   Unless otherwise noted, all *emphases* are added and internal quotation marks omitted.

[3]   While full-blown merits inquiries generally are inappropriate at the class certification stage, courts nonetheless have held that expert evidence that is not sufficiently probative should not be relied upon in evaluating whether class certification requirements are met.  *See, e.g., Cooper v. Southern Co.*, 390 F.3d 695, 712, 718 (11th Cir. 2004) (upholding denial of class certification where district court found that plaintiff's expert reports contained "methodological deficiencies," and failed to demonstrate compliance with Rule 23); *Bell v. Ascendant Solutions, Inc.*, No. 301CV0166N, 2004 WL 1490009, at *2 (N.D. Tex. July 1, 2004) (recognizing that "a *Daubert*-type review is not premature" at the class certification stage); *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004) ("[T]he question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met."); *Dean v. Boeing Co.*, 2003 U.S. Dist. LEXIS 8787, at *33-35 (D. Kan. Apr. 24, 2003) (at class certification stage, court should determine whether expert testimony is so fatally flawed as to be inadmissible as a matter of law).

DaVanzo, Ph.D., Pursuant to Rule 26(a)(2)(B) ("DaVanzo Rep.") at 4 (attached as Exhibit 4); 8/02/06 Declaration of Randall Haught ("Haught Decl.") at 19 (attached as Exhibit 5); 8/02/06 Rebuttal Declaration of Allen Dobson Ph.D. ("Dobson Decl.") at 26-28 (attached as Exhibit 6); 10/18/06 Rebuttal Declaration of Allen Dobson, Ph.D. in Connection with Pl's. Renewed Mot. for Class Cert. ("Dobson Class Decl.") at 17 (attached as Exhibit 7).[4]  Specifically, Boca's experts contend that, using the "Lewin Model," they "adjust[ed] the FLT to account for Tenet hospitals with CCRs that fell below the low National Threshold" and then compared the outlier payments hospitals would have received under these "Tenet-adjusted" FLTs to the outlier payments that the "Lewin Model" calculated hospitals should have received using the FLTs actually set by CMS—the difference between the two (according to Boca's experts) is the damages. DaVanzo Rep. at 23; *see also* Haught Decl. at 17-22.

**A.     The "Lewin Model"'s Adjusted-FLT Calculations Are Wholly Unconnected To Boca's Allegations of Wrongful Conduct.**

Boca's experts purport to "appl[y] [Boca's] theory of liability," Dobson Class Decl. at 7, by calculating what the FLT would have been but for Tenet's allegedly wrongful behavior. DaVanzo Rep. at 23; *see also* Haught Decl. at 17-22. But in calculating these "Tenet-adjusted" FLTs, Boca's experts simply replace certain Tenet hospitals' ***audited*** (or "settled") CCRs with ***unaudited*** (or so-called "actual") CCRs from a year prior. Haught Decl. at 7-9, 16-17; *see also* Haught Dep. Tr. at 69-71. Specifically, Boca's experts identify 76 Tenet hospitals that had unaudited operating CCRs that fell below the low National Threshold in one or more of the proposed class years. DaVanzo Rep. at 23. And, for those Tenet hospitals, Boca's experts use unaudited CCRs, instead of the settled CCRs used by CMS, in recalculating the FLT for each

---

[4]     During her deposition, Dr. DaVanzo could not explain how she derived her calculations or how the "Lewin Model" worked. *See* DaVanzo Dep. Tr. at 103-04, 110, 212-25 (attached as Exhibit 8). Instead, Dr. DaVanzo testified that she "relied on" others to calculate her results, DaVanzo Dep. Tr. at 124, and conceded that she did not design or specify the methodology to calculate damages, nor did she take any action to verify the work of others. *See id.* at 97-100, 104, 109-110. Therefore, on July 17, 2006, Tenet moved to exclude Dr. DaVanzo's testimony on the grounds that it failed to meet the fundamental requirements for admissibility. *See* 7/17/06 Tenet Mot. to Exclude Proffered Expert Report and Testimony of Joan DaVanzo, Ph.D. (attached as Exhibit 9). Rather than repeat its arguments in support of its prior motion, Tenet incorporates them by reference and addresses the additional issues now evident in light of Boca's subsequent expert disclosures and testimony.

year from 2000 to 2003. *Id.* at 23 & 4 n.2; *see also* Dobson Dep. Tr. at 255 (attached as Exhibit 10).[5]

To understand why this substitution of Tenet's CCRs leads to a lower "adjusted" FLT one need only understand the following mathematical relationship that underlies the "Lewin Model" "Tenet-adjusted" FLT calculation:

*Total Outlier Charges x Hospital-Specific CCRs = Projected Medicare Outlier Costs.*

*See* Haught Decl. at 7-9, 17-18; Haught Dep. Tr. at 63, 69-73. That is, Boca's experts assume that CMS calculated the FLT by projecting outlier costs based on hospitals' charges and audited CCRs.[6] Boca's experts then replaced Tenet's **audited** CCRs with lower **unaudited** CCRs (from a year prior)—*i.e.*, they substitute *lower* "Hospital-Specific CCRs" for 76 Tenet hospitals—and then multiplied these lower CCRs by the same Medicare charges ("Total Outlier Charges") for that period. Haught Decl. at 17-19. By multiplying a smaller fraction ("Hospital-Specific CCRs") against the same "Total Outlier Charges," Boca's experts calculate lower "Projected Medicare Outlier Costs." *Id.*; *see also* Haught Dep. Tr. at 69-73. Boca's experts then plug this *lower* estimate of "Projected Medicare Outlier Costs" into the "Lewin Model" which mechanically calculates a *lower* ("adjusted") FLT by solving for a FLT that will yield total

---

[5]    Boca's experts' identification of these 76 Tenet hospitals (so-called "turbochargers") is the result of a classic apples-to-oranges comparison — one which results in a dramatic overstatement of alleged damages. CMS calculates the low National Threshold based on all hospitals' most recently **settled** (audited) operating CCRs. *See* 9/29/06 Expert Report of Brian L. Palmer ("Palmer Rep.") at 4-6 (attached as Exhibit 11). However, for each year of the proposed class period, Boca's experts compared Tenet hospitals' **unaudited** CCRs to the low National Threshold calculated by CMS. DaVanzo Rep. at 1. Dr. Dobson concedes that CMS did not make such an apples-to-oranges comparison, Dobson Dep. Tr. at 214-15, thus Dr. Dobson's subsequent assertion that his methodology "is in accord with CMS'[s] bright line between reasonable and unreasonable CCRs" is nothing short of a misrepresentation. Dobson Class Decl. at 7. In any event, as Dr. Palmer explains, this apples (unaudited CCRs) to oranges (settled CCRs) comparison results in a dramatic overstatement of alleged "bad actors" and therefore an overstatement of alleged damages. Palmer Rep. at 6.

[6]    Notably, none of Boca's experts offer **any** evidence on how CMS actually calculated the FLT. This is especially troubling in light of Boca's experts' repeated claim that CMS's methodology to set the FLT is "right in the Federal Register." DaVanzo Dep. Tr. at 60. In fact, the Federal Register citations on which Boca's experts rely to support their view of how CMS set the IPPS-FLT have nothing to do with IPPS or outliers. *See* Haught Decl. at 7 (citing 67 Fed. Reg. 56003, 56023 (Aug. 30, 2002) (concerning Prospective Payment System for *Long-Term Care*), and 67 Fed. Reg. 66767, 66790 (Nov. 1, 2002) (concerning changes to the Hospital *Outpatient* Prospective Payment System)).

projected outlier payments equal to this lower estimate of projected costs.[7] Thus, contrary to Dr. Dobson's claim that the "Lewin Model" re-calculates outlier payments based on Tenet's "accurate costs," Dobson Class Decl. at 8, the "Lewin Model" methodology simply plugs a different set of (lower) CCRs—CCRs *not* used by CMS but that still reflect Tenet's real-world costs and charges (*i.e.*, the alleged "unlawfully" inflated charges)—into an algebraic equation in which all other variables are held constant.[8] The "Lewin Model" therefore is deterministic—it mechanically and automatically yields a lower FLT whenever lower CCRs are used. *See* Haught Dep. Tr. at 72-73.

Importantly, the lower unaudited CCRs used by Boca's experts reflect the ratio of Tenet's costs to its *actual charges* in each year of the proposed class period. *See, e.g.*, Dobson Class Decl. at 9 ("Tenet hospitals' actual CCRs [are] determined from their inflated charges ..."); Haught Dep. Tr. at 100-01. Thus, in Boca's experts' "but-for world" Tenet's allegedly unlawfully high charges remain *exactly the same as they were in the actual world.* Haught Dep. Tr. at 101 ("We don't assume any difference in [Tenet's] charges."); Dobson Dep. Tr. at 245 (Q: "[U]sing [Tenet's] contemporaneous cost-to-charge ratio you are using Tenet's actual charges during that period?" A: "Yes."); *id.* at 301-02. Moreover, Tenet's so-called "actual" or unaudited CCRs remain *below the low National Threshold*—Boca's magic line separating "turbochargers" from non-turbochargers. *Cf.* DaVanzo Dep. Tr. at 33-34 (testifying that had Tenet not engaged in alleged "turbocharging" its CCRs would have been higher). In short, Boca's experts assume that Tenet *continued to "turbocharge"* in the but-for world.[9]

---

[7] For example, in calculating the "Tenet-adjusted" FLT for FFY *2002*, Boca's experts, replaced a subset of Tenet hospitals' most recently settled CCRs with unaudited CCRs from FFY *2000*, and held all else equal, including other hospitals' settled CCRs. Haught Decl. at 7-9, 17-19; Haught Dep. Tr. at 70-71. Notably, for *non*-Tenet hospitals, the "Lewin Model" applies settled CCRs from the FFY 2002 Impact File. *See id.* Applying this methodology, the "Lewin Model" calculated lower "projected Medicare outlier costs" and thus calculated a lower projected ("Tenet-adjusted") FLT for FY 2002 ($19,662 vs. $21,025 actual). Haught Decl. at 17-19.

[8] Indeed, Dr. DaVanzo concedes that the "Lewin Model" calculation of so-called "excess outlier payments" to Tenet (based on unaudited CCRs) is *unrelated* to the Lewin calculation of damages to the proposed class and is—according to Dr. DaVanzo—merely "[b]ackground, context." DaVanzo Dep. Tr. at 250-51.

[9] Dr. DaVanzo initially disavowed this fundamental problem by claiming that she "do[es]n't deal in the but-for world." DaVanzo Dep. Tr. at 59; *see also id.* at 100 ("We don't do any but-fors.").

Therefore, the so-called "Tenet-adjusted" FLTs calculated by the "Lewin Model" are wholly unconnected to Tenet's alleged wrongful conduct.  Indeed, as Boca's expert, Mr. Haught, testified, the "Lewin Model" is incapable of isolating the impact of Tenet's alleged charging practices on the FLT:

> Q:      "If Tenet's charges are the same before and after, *how does that capture or isolate the impact of their charging practices*?"
>
> A:      "*It doesn't.*  We don't assume any difference in charges."

Haught Dep. Tr. at 101; *see also id.* at 103 (Q: "[H]ow would substituting Tenet's CCRs isolate turbocharging?" A: "It's a good question, but that's unfortunately something I didn't really look at.").  This is unsurprising because, as Dr. Dobson explains, the "Lewin Model" provides *no* indication of wrongful charging conduct.  Dobson Dep. Tr. at 246 ("[M]y damage model doesn't care whether [charges] are high or low."); *see also id.* at 172.  Rather, the "Lewin Model" is simply a "deterministic" set of algebraic formulae.  *Id.* at 193-94.

Thus, Boca's experts offer *no* opinion regarding what the FLT would have been but for Tenet's alleged wrongful conduct in each year of the proposed class period; they assume Tenet's alleged conduct remained unchanged.  Boca's experts instead—*admittedly*—opine only on what portion of the increase in the FLT was attributable (in their view) to *CMS* using an improper methodology to set the FLT.  DaVanzo Dep. Tr. at 178-79 (testifying that in calculating damages, Dr. DaVanzo purportedly replicated CMS's regulatory changes in August 8, 2003); Dobson Dep. Tr. at 278-79 (explaining that the "Lewin Model" methodology corrects for the then-current CMS regulations which allowed Tenet to receive outliers calculated by using time-lagged or settled CCRs); *see also id.* at 38-39, 301-02; Dobson Class. Decl. at 10.  As Dr. Dobson explained, he simply assumed, "at the advice of [Boca's] counsel," that Tenet's receipt of outlier payments in accordance with *then-existing CMS regulations* (requiring outlier payments to be calculated using settled or time-lagged CCRs) was "improper behavior."  Dobson Dep. Tr. at 278-79; *see also id.* at 255.  Therefore, the "Lewin Model" attempts to retroactively apply a 2003 change in CMS outlier payment regulations (only to Tenet).  Dobson Class Decl. at 10 (stating that the "Lewin Model" applies "[t]he same approach [that] was adopted by CMS in its new outlier regulations" in 2003).  Thus, contrary to Dr. Dobson's contention that the "Lewin Model" calculates a "Tenet adjusted FLT" (and damages) "based on the elimination of [Tenet's] wrongful behavior," *id.* at 9, Dr. Dobson and Boca's other experts make clear that the "Lewin

Model" simply alters what data CMS would use to calculate the FLT; they did **not** calculate the portion of the increase in the FLT that was allegedly attributable to Tenet. *Id.* at 10.

Boca's experts' failure to offer any methodology to calculate the impact of Tenet's alleged wrongful conduct on the FLT is particularly troubling in light of Boca's experts' own assessment of what a proper damages methodology in this case would entail. *See* 8/05/05 Letter from A. Dobson to H. Hirsch, Esq. ("Dobson Workplan") at 3 (attached as Exhibit 12). In an August 5, 2005 "workplan" submitted to Boca's counsel, Dr. Dobson described how members of The Lewin Group would "develop[] a methodology for calculating damages caused by Tenet hospitals and the impact that it had on the [proposed] class." *Id.* In this "workplan," Dr. Dobson stated that "[i]n order to estimate damages due to Tenet hospitals' actions, we would need to develop an assumption about how charges for Tenet hospitals should have increased over" the class period. *Id.* Dr. Dobson, moreover, concluded that "[i]n order to compute damages, [Boca's experts] would *need to estimate what the fixed-loss outlier threshold would have been assuming a different charging behavior from the Tenet hospitals*." *Id.* But, as discussed above, neither Dr. Dobson nor Boca's other experts have calculated what the FLT would have been but for or absent Tenet's alleged wrongful charging conduct. As Dr. Dobson later explained, Boca's experts abandoned a methodology to calculate damages based on Tenet's alleged charging conduct because doing so presented "a little bit of a tricky question." Dobson Dep. Tr. at 172-73; *see also id.* at 183-84.[10]

### B.   The "Lewin Model" Is Inherently Flawed Because It Implies That Boca and 84% of Proposed Class Members Caused Damages To Themselves.

Having abandoned a methodology to calculate a "Tenet-adjusted" FLT (and therefore damages) based on Tenet's alleged wrongful conduct, Boca's experts instead opted to employ a methodology that merely substitutes one set of Tenet-related data (settled CCRs) for another (non-settled CCRs). In doing so, however, Boca's experts overlooked a simple, yet startling fact:

---

[10]   Dr. Dobson now contends that a methodology "based on what Tenet 'would have done'" is "speculative" and claims that he "works with what actually happened." Dobson Class Decl. 9-10. Dr. Dobson, however, misses the point. The issue is not whether Tenet's alleged wrongful conduct is known but whether that conduct had a direct and measurable effect on the FLT and what the FLT would have been absent that alleged conduct. Neither Dr. Dobson nor Boca's other experts, however, provide any opinion on these issues because their proposed methodology wholly ignores Tenet's alleged conduct and instead simply alters *CMS's* behavior.

applying this methodology implies that ***Boca and 84% of the hospitals within the proposed*** ***class caused damages to themselves***, *i.e.*, Boca and nearly every proposed class member caused the FLT to increase. Palmer Rep. at 11 & n. 25.

The "Lewin Model" will—as Boca's experts concede—mathematically calculate a lower "adjusted" FLT ***whenever*** a hospital's unaudited CCR is *lower* than its settled CCR. Haught Dep. Tr. at 73 (Q: "[T]he Lewin model methodology would predict the lower fixed loss threshold so long as the CCRs were changed, the HCRIS [unaudited] CCRs were substituted for that particular hospital were lower than its impact [settled] CCRs?" A: "Yes."); *see also id.* at 70-72; Dobson Dep. Tr. at 187-88. Therefore, logically, the "Lewin Model" implies that whenever a hospital's unaudited CCR is lower than the settled CCR used by CMS to calculate the FLT, that hospital would—as Boca's experts contend—"directly cause" the FLT to be higher than it otherwise would have been and therefore caused damages to the proposed class. The reason for this is clear: the "Lewin Model" does not and cannot distinguish "good" from "bad" charging conduct and, instead, merely plugs in a lower number into an algebraic equation to mechanically calculate a lower "adjusted" FLT. *See* Dobson Dep. Tr. at 106; *see also* DaVanzo Dep. Tr. at 104; Haught Dep. Tr. at 70-73.

Boca itself provides one example. Because Boca's unaudited CCRs were lower than the settled CCRs used by CMS to calculate the FLT (because Boca significantly increased its charges during the proposed class period), if one plugs Boca's unaudited CCRs into the "Lewin Model," the "Lewin Model" calculates a *lower* "Boca-adjusted FLT." Haught Dep. Tr. at 102; *see also* 9/29/06 Expert Report of Stefan Boedeker ("Boedeker Rep.") at 12 (attached as Exhibit 13). As Mr. Boedeker demonstrates, the "Lewin Model" calculates that Boca directly caused damages to the proposed class totaling $1.3 million by causing the FLT to increase. *Id.* Similarly, ***84% of the hospitals within the proposed class*** had unaudited CCRs that were *lower* than the settled CCRs used by CMS to calculate the FLT. Palmer Rep. at 11 & n. 25; *see also* 9/29/06 Declaration of Brian L. Palmer ("Palmer Decl.") at 16 (attached as Exhibit 14). Therefore, the "Lewin Model" implies that 84% of the proposed class caused the FLT to increase and caused damages, *see id.*, totaling nearly ***$3 billion.*** Boedeker Rep. Exhibit 2.

Boca's experts claim that the "fact that the Lewin model can calculate the impact on the FLT of behavior that is ***not improper*** under Plaintiff's theory is not relevant." Dobson Class

Decl. at 11.  However, the fact that the "Lewin Model" algebraically calculates that nearly every proposed class member "directly caused" damages by increasing the FLT—although, according to Boca's experts, their behavior was "not improper"—plainly demonstrates that the "Lewin Model" does not calculate the impact of *wrongful* conduct.  Indeed, Boca's experts' rationalization that non-Tenet hospitals' behavior was "not improper" begs the question how could the "Lewin Model" "isolate[] Tenet's wrongful conduct," *id.*, if applying the same methodology to virtually every class hospital (including Boca) would imply that damages were caused by those hospitals that Boca claims did not engage in wrongful conduct.

C.    **The "Lewin Model" Suffers Basic Flaws In Execution And Is Not "Validated" According To Even Boca's Experts' Own Subjective Standards.**

Beyond the fundamental methodological flaws of the "Lewin Model," Boca's experts have failed to execute their proposed methodology in a consistent manner and, in fact, have failed to satisfy even their own subjective standards for reliability.  Indeed, Mr. Haught admits that many known errors in the "Lewin Model" methodology have not yet been corrected, *id.* at 54-56, 179, and that Boca's experts are "continuing to compile a list of problems" with their calculations.  *Id.* at 51.

(1)    **The "Lewin Model" Fails To Replicate CMS's Methodology.**

As an initial matter, contrary to Dr. DaVanzo's claim that the "Lewin Model" uses the "exact same" methodology to calculate the FLT as CMS did, DaVanzo Dep. Tr. at 104, Mr. Haught makes clear that the "Lewin Model" does *not* replicate either CMS's methodology to calculate the FLT or how Fiscal Intermediaries (FIs) calculated outlier payments to hospitals.  *See, e.g.,* Haught Dep. Tr. at 74, 77-79, 87-88, 123; Haught Decl. at 7-8; *see also* Dobson Dep. Tr. at 255; *see also id.* at 356 ("We never claimed to use the CMS methodology.").  Indeed, Mr. Haught confirms (and as the table below illustrates), the "Lewin Model" does not even use the same data or inputs that CMS used when calculating either the FLT or outlier payments.  As Dr. Dobson explains, the "Lewin Model" used different data to calculate outlier payments than CMS because, by using different data, Boca's experts got much better results.  Dobson Dep. Tr. at 267.

In other words, failing to replicate CMS's calculations, Boca's experts simply used different data rather than re-assess the accuracy of their methodology.[11]

### Table 1: 2002 FLT and Outlier Payment Calculations:  CMS vs. "Lewin Model"

| Data Inputs | Data Used By CMS | Data Used By The "Lewin Model" |
|---|---|---|
| CCRs Used In Calculating the FLT in 2002 | *For all hospitals:* March 2001 Update to the FFY 2000 Provider Specific File (*i.e.*, CMS used *settled* CCRs as of FFY *2000*) | *For non-Tenet hospitals:* FFY 2002 Impact File (*i.e.*, Boca's experts used most recently *settled* CCRs as of FFY *2001*)[12]<br><br>*For Tenet hospitals:*  2000 HCRIS File (*i.e.*, Boca's experts used CCRs calculated from FFY 2000 cost reports or *unaudited* CCRs submitted in FFY 2000) |
| CCRs Used In Calculating Outlier Payments in 2002 | *For all hospitals:*  The most recently *settled* CCRs. | *For non-Tenet hospitals:*  FFY 2003 Impact File (*i.e.*, Boca's experts  used *settled* CCRs )<br><br>*For Tenet hospitals:*  2002 HCRIS File (*i.e.*, Boca's experts used CCRs calculated from FY 2002 cost reports or *unaudited* CCRs submitted in FFY 2002) |

*See* Haught Decl. at 7-8 (citing 66 Fed. Reg. 39927, 39939-41 (Aug. 1, 2001)), 17-21; *Cf.* DaVanzo Rep. at 24 ("I applied the [Lewin] model to the *same data files* that CMS would have used in each of the relevant years.").

### (2)   Boca's Experts Failed To Apply A Consistent Methodology.

Boca's experts' results-oriented methodological approach to calculating "damages" is evidenced by Boca's experts' decision to change their methodology for 2003.  Palmer Rep. at 28-29.  Although Boca's experts calculated outlier payments for 2000-2002 for non-Tenet

---

[11]  Notably, Boca's experts cannot agree on what data CMS used to calculate the FLT. Mr. Booth, Boca's Medicare expert and former CMS employee, concludes that the CMS FLT is based on fifteen months of claims data.  6/16/06 Expert Report of Charles R. Booth at 11 (attached as Exhibit 15).  In "replicating" and recalculating the FLT, however, the "Lewin Model" uses only twelve months of claims data. Haught Decl. at 8-9, 17-18; *see also* Dobson Dep. Tr. at 335.

[12]  Because CMS determines the FFY 2002 FLT between May and September of *2001*, it is inconceivable how CMS could use the FY 2002 Impact file (compiled at the close of FFY 2001, *i.e.*, *after* September 30, 2001) to determine the FFY 2002 FLT. Similarly, when calculating outlier payments in *2002*, Fiscal Intermediaries (FIs) would not, of course, have access to the FFY *2003* Impact file, which is compiled after the close of FFY 2002. Dr. Dobson's suggestion to the contrary, Dobson Dep. Tr. at 264-65, is wholly without support and is entirely counter-factual.  In fact, Dr. Dobson ultimately conceded, that he "do[es]n't really know … what [CCRs] the intermediaries actually used" when calculating outlier payments.  *Id.* at 265.

hospitals using settled CCRs derived from data files *one year forward* in time (*i.e.*, settled CCRs from 2001-2003 Impact Files), to calculate outlier payments for non-Tenet hospitals *for 2003* they used settled CCRs derived from a data file of the *same* year (*i.e.*, FFY 2003 Impact File). Haught Decl. at 32-34. Thus, in calculating damages for 2002 *and* 2003, the "Lewin Model" used non-Tenet same settled CCRs. *Id.* at 20. Dr. Dobson dismissed this *ad hoc* methodological shift because, according to Dr. Dobson, 2003 was a "year of transition" and it was "not altogether clear the model and base would work as well" had Boca's experts applied the same methodology consistently throughout the proposed class period. Dobson Dep. Tr. at 146. Mr. Haught, however, acknowledges that he and Boca's other experts *could have* calculated outlier payments for 2003 in a manner consistent with other class years, Haught Dep. Tr. at 83-84, 95-96, but failed to do so. Mr. Haught, moreover, testified that "we just intuited" a change in methodology for 2003 and did not examine the consequences of this change. *Id.* at 84.

Boca's experts' failure to apply a consistent methodology to calculate outlier payments (and thus "damages") is far from simply an academic criticism. The consequences of their *ad hoc* methodological change for 2003 are significant: it results in "damages" for that year being **overstated by up to 40 percent**. Palmer Rep. at 30. Had Boca's experts applied the same methodology for 2003 as they applied for other years of the proposed class (and simply corrected for a change in CMS regulations which eliminated the SWA CCR as a basis for outlier payments), the "Lewin Model" would calculate "damages" for year of approximately $194 million instead of $271 million. *Id.*

### (3) Boca's Experts Offer No Objective Basis To Assess Their Results, Which Fail To Meet Even Their Own Subjective "Standard" of Reliability.

Boca's experts claim to "verify that the Lewin model is accurately simulating CMS'[s] methodology," Haught Decl. at 9, by "comparing the outlier payments as a percent of total payments [] from the Lewin model with the CMS target of 5.1 percent." *Id.* at 15; *see also* DaVanzo at 24. Boca's experts refer to this comparison as "validation" or "calibration." *Id.*; *see also* Dobson Dep. Tr. at 126. Thus, for example, if the "Lewin Model" calculates total projected outlier payments to be equal to outlier payments calculated by CMS, Boca's experts consider the

model to be "validated" and working properly.  But Boca's experts offer no objective test to determine whether the "Lewin Model" is "validated."[13]  Instead, whether the "Lewin Model" is "validated," *i.e.*, whether their model's calculated results are "close enough" to actual CMS results, is left entirely to their subjective interpretation.  Haught Dep. Tr. at 83 (Q: "How do you determine what's close enough?"  A: "From past experience.  It's my opinion.");  Dobson Dep. Tr. at 128 ("We, it was our judgment that our results were close enough.").  Indeed, when asked how he determined whether the "Lewin Model's" was "calibrated," Dr. Dobson responded simply "my judgment."  Dobson Dep. Tr. at 140.  Ultimately, when pressed, Mr. Haught offered that where the "Lewin Model's" calculated results were off by "say 5 to 10 percent" from CMS results, the model would need to be "recalibrate[d]," *i.e.*, the "Lewin Model" would not yield reliable results for that period.  Haught Dep. Tr. at 89; *cf.* Dobson Dep. Tr. at 157-58 (testifying that a 15% to 20% variance between the "Lewin Model" and CMS results would cause Dr. Dobson to "think about [validation] more").

This lack of an objective measure of the reliability of the "Lewin Model" is troubling in light of the numerous (acknowledged) errors in the so-called "validation" process.  As Mr. Haught concedes, in "validating" the Lewin results, he compared the "Lewin Model" results to the ***wrong*** CMS data for each year of the proposed class period!  Haught Dep. Tr. at 86-95.  For example, although CMS used only *operating* outlier payments to calculate projected outlier payments (equal to 5.1 percent of total DRG payments), Boca's experts calculated both operating ***and*** capital outlier payments and then compared this combined figure to CMS's projected *operating* outlier figure.  *Id.*; *see also* 67 Fed. Reg. 50081, 50125 (Aug. 1, 2002).  Mr. Haught thus compared the "Lewin Model" results to the wrong CMS data to determine whether his results were "close enough."  Therefore, in performing this "validation" exercise, Mr. Haught began with "Lewin Model" results that were overstated by as much as 8-12%.  Dobson Class Decl. at 20; *see also* Dobson Dep. Tr. at 117-18.

---

[13]  Notably, Boca's experts never compared the outlier payments that they calculated a hospital received in the "actual world"—the first step "replicating" CMS payments—to what CMS actually paid a given hospital.  Haught Dep. Tr. at 80-81.  Having failed to conduct such a simple test of reliability, Mr. Haught concedes that the "Lewin Model's" projected hospital outlier payments "***could have been very, very far off.***"  *Id.* at 81.

Boca's experts' "validation" of their methodology suffers an even greater error for 2003. For that year, Mr. Haught concluded that CMS calculated the aggregate outlier percentage to be 6.1% (based on an estimate in a 2003 Federal Register). Haught Dep. Tr. at 90-95. Thus, in validating the "Lewin Model" for that year, Mr. Haught compared the "Lewin Model" calculated outlier percentage — 6.5% — to 6.1% and concluded that the "Lewin Model" was "validated" because his results were only off by 7% from what he believed CMS's actual results. *Id.* The *actual* CMS calculated outlier percentage for 2003, however, was only *5.7%,* not the 6.1% Mr. Haught used in validating his model. *Id.* at 90-94; *see also* 69 Fed. Reg. 28345, 28377 (May 18, 2004). Therefore, the difference between the CMS actual and "Lewin Model" calculated results for 2003 was actually *over 14%*—well beyond Mr. Haught's "say 5 to 10 percent" *ad hoc* standard for determining whether the "Lewin Model" was validated and reliable. Haught Dep. Tr. at 89; *see also* Dobson Dep. Tr. at 148-49 (acknowledging that the magnitude of error in the "Lewin Model" "validation" for 2003 is in the order of "hundreds of millions of dollars.").

These errors in "validation" and specification are not slight. As Dr. Palmer explains, the difference between CMS calculated (or actual) results and "Lewin Model" results for *a single year* exceeds $650 million, which is greater than the total damages calculated for the proposed class period. Palmer Rep. at 31-32. Moreover, Dr. Dobson concedes that Boca's model suffers from a *$1.4 **billion** calibration error for 2002* alone. Dobson Dep Tr. at 324-27, 329-30.[14]

Yet, despite these enormous (and known) calculation errors, Boca's experts maintain that the "Lewin Model" is validated and reliable—at least, for the time being:

> Q:    "[] Mr. Haught also concludes [that] with these changes that the model is validated and calibrated, correct?"

---

[14] Dr. Dobson claims that "CMS advised" plaintiff's counsel that aggregate outlier payments for FFY2002 were approximately $5.6 billion (a figure closer to the "Lewin" calculated results) and cites an email from Michael Treitel, an employee of CMS's Division of Acute Care. The information provided in this email, however, is contrary to CMS's official statement in the Federal Register. *See* 68 Fed. Reg. 34493, 34496 (Jun. 9, 2003) (indicating actual operating outlier payments for 2002 were approximately $7.05 billion ($2.5 billion excess outlier payments over 5.1 percent *x* 7.9 percent actual outlier percentage for 2002 / 2.8 percent difference between actual and target outlier percentage = $7.05 billion in operating outlier payments for 2002)). In addition, the Federal Register citation that Mr. Trietel references in his email to Boca's counsel does *not* indicate that CMS's aggregate outlier payments in FFY 2002 were $5.6 billion. Rather, it merely indicates that the CMS outlier percentage was estimated to be 7.8% instead of 7.9% as CMS previously indicated—indicating CMS aggregate operating outlier payments for FFY 2002 were approximately $6.9 billion, not $5.6 billion as Mr. Trietel suggests and on which Dr. Dobson relies.

A:    "At this point, yes."

Q:    "What do you mean by that?"

A:    "Well, we will wait until we see the next round of your [Tenet's] experts' reports."

Dobson Dep. Tr. at 59; *see also* Haught Dep. Tr. at 50 ("I'm sure we're going to find some other revisions to make.").[15]

Dr. Dobson's flip response underscores Boca's experts' lack of rigor in formulating an appropriate damages methodology. Indeed, despite the known errors in design and execution, Dr. Dobson, incredibly, claims that a "model is valid if it generates results that comport with its goal." Dobson Class Decl. at 11. Thus, according to Dr. Dobson, because the "Lewin Model" was designed to show damages and it purportedly produced results consistent with that goal it is "valid." This logic, however, is as absurd as suggesting that a model designed to calculate 2+2=5 is "valid" if it produces a result of 5. Dr. Dobson thus reveals that he offers no objective basis to determine the validity or reliability of his proposed damages methodology.

**(4)    The "Lewin Model" Was Not Designed To Calculate Damages.**

The "Lewin Model's" lack of reliability in calculating damages is not surprising because it was never designed to calculate damages. *E.g.*, Haught Dep. Tr. at 33 (Q: "Was [the Lewin Model] designed to calculate damages in a civil case?" A: "No. It wasn't its original intent."); Dobson Dep. Tr. at 98; Dobson Decl. at 5 ("[T]he "Lewin model"[] that we used in this analysis was not developed for this litigation."). Therefore, the "Lewin Model" had to be "adapted" for use in this case. Haught Dep. Tr. at 125; *see also id.* at 142 (noting that Dr. DaVanzo's references in her "Supplemental Expert Report" to "wide use of the Lewin model" did *not* refer to the "Lewin Model" as formulated for this case). Further, as Mr. Haught explains, the "Lewin

---

[15]  Tellingly, Dr. DaVanzo originally concluded that the model was "validated" although it—admittedly—did not account for the different payment methods associated with Sole Community Hospitals (SCHs) and hospitals that had not elected to enter the prospective payment system for capital outliers between 2000-2001, and failed to apply the correct CMS FLTs for 2001. DaVanzo Rep. at 27; *see also* Haught Dep. Tr. at 21-22, 47-51. Dr. Dobson, moreover, claims that errors in "validation" are unimportant because "the calculation of total outlier payments for a year by the Lewin model has no effect on the calculation of the Tenet-adjusted FLT." Dobson Class Decl. at 15. Dr. Dobson and Boca's other experts, however, point to these "validation" exercises to claim that the "Lewin Model" is reliable. *See, e.g.*, Dobson Decl. at 112-13; DaVanzo Rep. at 27; Haught Decl. at 7-9. Dr. Dobson's subsequent dismissal of these errors in "validation" as unimportant is, at best, puzzling and reveals that Boca's experts give no meaning to their term "validated."

found that plaintiff's expert reports contained "methodological deficiencies" and failed to demonstrate compliance with Rule 23).

Boca's damages methodology fails to meet these minimum standards for admissibility under *Daubert* and Federal Rule of Evidence 702 and is fundamentally flawed, because it, among other things, fails to calculate the impact of Tenet's alleged wrongful conduct on the FLT and suffers from numerous flaws in its application.

## I. THE "LEWIN MODEL" IS INCAPABLE OF CALCULATING DAMAGES BASED ON TENET'S ALLEGED WRONGFUL CONDUCT AND IS THEREFORE IRRELEVANT AND INADMISSIBLE.

Boca's expert testimony must be excluded because it is not "sufficiently tied to the facts of the case." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985); *see also Daubert*, 509 U.S. at 591 (requirement that testimony "assist the trier of fact to understand the evidence or to determine a fact in issue … goes primarily to relevance"). It is black-letter law that "expert" evidence must have a "valid … connection to the disputed facts in the case" and "logically advance [] a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312. Thus, a plaintiff's damages methodology must "project a hypothetical or "but-for" condition that excludes only the effects of the defendant's illegal conduct." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 25 n. 3 (1st Cir. 1999); *see also Group Health Plan, Inc. v. Phillip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003) (A "disconnect between [a damages expert's] work and the [plaintiff's] theory of liability weighs heavily against the admission of [the expert's] testimony under *Daubert* because it undermines the existence of a legal nexus between the injury and ***the defendants' wrongful conduct***.") (emphasis in original). Quite simply, a damages methodology that is not connected to a plaintiff's theory of liability is wholly speculative and irrelevant and thus inadmissible. *See Group Health Plan*, 344 F.3d at 760 (affirming exclusion of expert evidence that was "inconsistent with one of the main premises underlying the [plaintiff's] theory of [] liability" because it would not assist the trier of fact); *McDowell v. Brown*, 392 F.3d 1283, 1299-1301 (11th Cir. 2004) (affirming exclusion of expert evidence that did not "'fit' as evidence relevant to the cause of plaintiffs' injuries" where the "only connection between the [expert's] conclusion[s] and the existing data [was] the expert's own assertions"); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir.

Model" failed to account for several provisions of the IPPS because "[t]here was not a real outcry for the use of the model until this past year," Haught Dep. Tr. at 41, when The Lewin Group was approached by Boca. *Id.* at 33 ("[W]e haven't kept up with it for a little while.").

Because Boca's experts have failed to "adapt" the "Lewin Model" in a consistent and reliable manner, and because the "Lewin Model" is incapable of calculating the impact of Tenet's alleged wrongful conduct, Tenet respectfully submits that Dr. DaVanzo's report and all "expert" opinions relating to alleged damages that are based on the "Lewin Model" should be excluded and not considered on class certification or for any other purpose.

## ARGUMENT

The Supreme Court has instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert or scientific testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). As "gatekeeper," the Court's "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). Therefore, expert testimony may be admitted into evidence only if: (1) the expert is qualified to testify competently regarding the matters he or she intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine facts in issue. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also* Fed. R. Evid. 702. Thus, "[t]he proponent of the expert testimony carries a substantial burden under [Fed. R. Evid.] 702." *Cook ex rel. Estate of Tessier*, 402 F.3d at 1107; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The Eleventh Circuit, moreover, has recognized that a proponent of expert testimony bears this burden even at the class certification stage, and the court must conduct "a rigorous analysis of the evidence proffered." *Cooper v. Southern Co.*, 390 F.3d 695, 712, 718 (11th Cir. 2004) (upholding denial of class certification where district court

2003) (affirming exclusion of expert testimony that did not properly discern between lawful and unlawful conduct).

Here, Boca's theory of liability is clear: Boca alleges that Tenet "unlawfully took more than its fair share" of outliers, Am. Compl. ¶ 1, by "intentionally inflating gross charges to increase Medicare operating cost outlier payments by driving the cost to charge ratios ("CCR") down below the low National Threshold." DaVanzo Rep. at 1; *see also* DaVanzo Dep. Tr. at 33; Dobson Dep. Tr. at 29. In short, "Boca contends that Tenet engaged in an [*sic*] scheme to artificially *inflate its patient charges* to increase its outlier reimbursements." 11/29/05 Mem. in Support of Boca Mot. for Partial Summ. Judg. at 4.[16]

But, as described above, Boca's proposed damages methodology (the "Lewin Model") posits a "but-for world" in which Tenet's allegedly unlawfully high charges remain exactly the same as they were in the actual world and Tenet's so-called "actual" CCRs remain below the low National Threshold—*i.e.*, Boca's experts assume that Tenet *continued to "turbocharge"* in the but-for world. Thus, Boca's experts offer no opinion on what portion of the increase in the FLT in each year of the proposed class period was attributable to *Tenet's* allegedly unlawful conduct. Indeed, the fact that the "Lewin Model" implies that Boca and virtually every proposed class hospital "directly caused" damages by increasing the FLT underscores the fact that the "Lewin Model" does not (and cannot) measure the impact of "wrongful" conduct. Rather, Boca's experts (admittedly) opine only on what data *CMS* should have used (unaudited versus settled CCRs) to calculate the FLT during the proposed class period and on what the FLT would have been had CMS used *any* lower unaudited CCRs—not just lower unaudited CCRs that were below the low National Threshold, the conduct which Boca claims is unlawful. *See* DaVanzo Dep. Tr. at 178-79; Dobson Dep. Tr. at 278-79 (explaining "Lewin Model" methodology corrects for the then-current CMS regulations which allowed Tenet to receive outliers calculated using time lagged CCRs); *id.* at 38-39; Haught Dep. Tr. at 69-70; Dobson Class Decl. at 10 (stating the "Lewin Model" applies the 2003 change in CMS's outlier payment regulations

---

[16]   *See also* 8/31/06 Order Denying Parties' Cross Motions for Summ. Judg. at 2 (denying cross-motions for summary judgment, in part, because "the facts as to what or how hospitals generally charge for outliers or, more importantly, what or how Tenet actually charged its outliers, have not yet been fully developed.").

retroactively to Tenet). Boca's experts' damages opinions therefore are unconnected to Boca's theory of liability; they calculate damages based on *lawful* as well as unlawful conduct; and therefore, they are wholly speculative and inadmissible. *See Williamson Oil Co.*, 346 F.3d at 1323; *Group Health Plan*, 344 F.3d at 760; *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, Civ. No. 1:04-CV-1082-TWT, 2006 WL 1663357, at *5 (N.D. Ga. June 14, 2006) (excluding expert testimony on the grounds it did not "fit" facts of the case because the expert's "inability or failure to allocate damages between legal and actionable conduct highlights the fact that [the expert's] testimony would not assist the trier of fact").

## II.   THE "LEWIN MODEL'S" DAMAGES CALCULATIONS ARE INHERENTLY UNRELIABLE.

Even putting aside the methodological deficiencies of the "Lewin Model," Boca's proposed damages methodology also fails to meet the minimum standards for reliability under Fed. R. Evid. 702. *See also Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1358 (S.D. Fla. 1999) (excluding expert testimony where plaintiff failed to show proffered expert "applied [] models in a manner that ensures a sufficiently reliable opinion to assist the jury in its factual determination"). As courts have repeatedly recognized, "the trial court's gatekeeping role under *Daubert* is to make certain that an expert … employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field*." *United States v. Falcon*, 245 F. Supp. 2d 1239, 1242-43 (S.D. Fla. 2003); *see also Cook*, 402 F.3d at 1107. Here, Boca's experts have failed to apply this necessary "intellectual rigor" because they have not executed their proposed methodology in a consistent manner and, in fact, have—admittedly—failed to satisfy even their own "standards" for reliability.

*First*, the "Lewin Model" fails to replicate CMS's methodology to calculate the FLT or replicate the manner in which outlier payments were calculated by FIs. *See, e.g.*, Haught Dep. Tr. at 74, 77-79, 87-88, 123; Haught Decl. at 7-8; *see also* Dobson Dep. Tr. at 356 ("We never claimed to use the CMS methodology."). That is, the "Lewin Model" does not use the same data that CMS used when calculating the FLT or that FIs used when calculating outlier payments. *See* Table *supra*; *see also* Haught Decl. at 7-8, 17-21. Boca's experts used different data or inputs to calculate outlier payments because it allowed them to derive a damages calculation "much more approximating what [they] were looking for." Dobson Dep. Tr. at 267; *see also id.*

at 263 (explaining that Boca's experts used different CCRs than CMS used to calculate payments because "our payments weren't coming up where we'd like them"). Thus, failing to replicate CMS's calculations, Boca's experts simply used different data to get their desired results. Such a contrived approach to calculating damages underscores the lack of reliability of Boca's experts' proposed damages model. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n. 7 (11th Cir. 2005) (noting that "a district court may properly consider whether the expert's methodology has been contrived to reach a particular result" in assessing reliability).

*Second*, Boca's experts have failed to apply their methodology consistently. Palmer Rep. at 28-29. For example, not achieving the desired output (*i.e.*, "damages") for 2003, Boca's experts simply changed their methodology for that year alone. Haught Dep. Tr. at 83-84, 95-96. As Dr. Palmer demonstrates, this *ad hoc* methodological change resulted in Boca's experts' overstating damages by up to *40 percent* for 2003 alone. Palmer Rep. at 30.

*Third*, Boca's experts' methodology lacks any objective standards of reliability. Boca's experts determined whether the "Lewin Model" was "validated" or reliable based solely on their subjective judgment. *See, e.g.,* Haught Dep. Tr. at 83; Dobson Dep. Tr. at 128 ("We, it was our judgment that our results were close enough."). Boca's experts, moreover, never analyzed or tested whether their "judgment" was correct, Haught Dep. Tr. at 108, or compared what the "Lewin Model" calculated a hospital received in the "actual world" to what CMS *actually* paid a given hospital. *Id.* at 80-81 (testifying that their failure to compare Lewin Model results to actual CMS results means that predicted hospital outlier payments "*could have been very, very far off*"). This failure to assess objectively the results of the "Lewin Model" underscores its lack of reliability. *See McCorvey v. Baxter HealthCare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (district court properly excluded expert testimony as unreliable where expert neglected to subject his causation opinions to thorough testing); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (upholding district court's exclusion of expert testimony as unreliable where expert "performed no tests" of reliability).

*Fourth*, the eyeball comparisons that Boca's experts did perform failed to meet even Boca's experts' subjective "standards" for reliability. Haught Dep. Tr. at 89; *cf.* Dobson Dep. Tr. at 157-58. Indeed, most telling of the "Lewin Model's" lack of reliability is the fact that Boca's experts "validated" the model (*i.e.*, compared aggregate "Lewin Model" calculated

results to CMS's 5.1% outlier percentage target) using the *wrong* CMS data for each year of the proposed class period. Haught Dep. Tr. at 86-95. Incredibly, the known errors in the "Lewin Model's" "validation" calculation for a single year of the proposed class period exceed Boca's total estimated damages for the entire class period. Palmer Rep. at 31-32; *see also* Dobson Dep. Tr. at 148-49 (acknowledging that the magnitude of error in the "Lewin Model" validation for 2003 is "hundreds of millions of dollars."). And, astoundingly, Dr. Dobson concedes that Boca's damages model suffers from a *$1.4 billion calibration error for 2002* alone, more than twice Boca's calculated "damages" for the entire class period. Dobson Dep Tr. at 324-27, 329-30; *see also* note 14, *supra*. Despite these known errors, Boca's experts contend that the "Lewin Model" is reliable. But the Supreme Court has clearly held that testimony must be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also* Fed. R. Evid. 702, advisory committee notes, 2000 amendment ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.") (internal citations omitted).

In short, these errors in calculation and application render the "Lewin Model" unreliable and inadmissible under Fed. R. Evid. 702. *See, e.g., KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) (excluding expert's testimony because "the cumulative effect of his methodological errors renders" damages calculations "speculative, without foundation"); *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003) (excluding expert testimony as "grossly unreliable" where expert used inaccurate figures and lacked reasoned explanations for certain multipliers in damages calculations).

## CONCLUSION

For the foregoing reasons, all "expert" opinions and testimony regarding Boca's alleged damages based on the so-called "Lewin Model" should be excluded, and not relied upon for any purpose.

/s Martha R. Mora

On behalf of Tenet Healthcare Corp.

<table>
<tr><td>

Peter Prieto (FL Bar No. 501492)<br>
Martha R. Mora (FL Bar No. 648205)<br>
HOLLAND & KNIGHT LLP<br>
701 Brickell Avenue, Suite 3000<br>
Miami, FL 33131<br>
(305) 374-8500 (tel.)

</td><td>

Jay P. Lefkowitz<br>
Karen N. Walker<br>
Susan E. Engel<br>
Patrick M. Bryan<br>
KIRKLAND & ELLIS LLP<br>
655 Fifteenth Street, N.W.

</td></tr>
</table>

(305) 789-7799 (fax)                     Washington, DC  20005
                                         (202) 879-5000 (tel.)
                                         (202) 879-5200 (fax)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-80183-CIV-SEITZ/MCALILEY

|  |  |
|---|---|
| BOCA RATON COMMUNITY HOSPITAL, INC., a Florida not-for-profit corporation d/b/a BOCA RATON COMMUNITY HOSPITAL, on behalf of itself, and on behalf of a Class of all others similarly situated, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TENET HEALTHCARE CORPORATION, | ) ) |
| Defendant. | ) ) ) |

### CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Martha R. Mora
Martha R. Mora

## SERVICE LIST

*Boca Raton Community Hospital, Inc. v. Tenet Healthcare Corp.*
Case No. 05-80183-CIV-SEITZ/McALILEY
United States District Court, Southern District of Florida


Hilarie Bass
BassH@gtlaw.com
David A. Coulson
CoulsonD@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Ph: 305-579-0500
Fax: 305-579-0717
Served electronically via CM/ECF & via email (PDF format)

Hal M. Hirsch
hirsch@gtlaw.com
John F. Triggs
triggsj@gtlaw.com
Richard A. Edlin
edlinr@gtlaw.com
Greenberg Traurig, P.A.
200 Park Avenue
New York, N.Y. 10166-0005
Ph: 212-801-9200
Fax: 212-801-6400
Served electronically via CM/ECF & via email (PDF format)

Robert P. Charrow
charrowr@gtlaw.com
William B. Eck
eckw@gtlaw.com
Greenberg Traurig, P.A.
800 Connecticut Avenue, NW, Ste.500
Washington, D.C. 20006
Ph: 202-331-3100
Fax: 202-331-3101
Served electronically via CM/ECF & via email (PDF format)